**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

**JEREMIAH E. BEAZLEY,**

      **Petitioner,**

**vs.**                             **CASE NO. 5:04cv3-RH/WCS**

**JAMES CROSBY,**

      **Respondent.**

_____/

## REPORT AND RECOMMENDATION

This is a petition for writ of habeas corpus filed by Jeremiah E. Beazley pursuant to 28 U.S.C. § 2254.  Doc. 1.  Petitioner challenges his convictions for attempted manslaughter with a firearm (count one), discharging a firearm within 1,000 feet of another person (count two), shooting at or into a dwelling (counts three, four, and five), and possession of a firearm having been previously convicted of a felony (count six). The convictions were in the Circuit Court of the Fourteenth Judicial Circuit, in and for Bay County, Florida, case number 97-2580, after a jury trial.  Petitioner is serving a 30 year sentence as to the first five counts.  Respondent filed an answer, doc. 5, and exhibits, doc. 6.  Petitioner filed a traverse.  Doc. 11.  Respondent concedes that the

petition was timely filed and that state court remedies as to each claim have been

exhausted.  Doc. 5, p. 2.

**Summary of the Evidence at Trial**

The following is a summary of the evidence at trial from Petitioner's brief on direct

appeal:

> [Petitioner] was charged with attempted first-degree murder of Demello [sic, Domello] Bolware (V1-31), discharging a firearm within 1,000 feet of another person, and three counts of shooting into a building.
>
> Evidence showed that the occupants of a red Ford Mustang shot a semi-automatic firearm approximately fifteen times as they drove past the Bolware residence.  Bullets were later found in or near three houses on the street.
>
> An —11 machine pistol was later recovered from the home of George Perkins.  Forensic experts determined that bullets recovered from the scene were fired by that pistol.  George Perkins testified that [Petitioner] and Rob Martin brought the machine pistol and a .357 revolver to his house the evening of the shooting.
>
> Shannon Knight testified she drove the red Mustang by the Bolware residence with [Petitioner] and Rob Martin as passengers, and that [Petitioner] fired several shots at the Bolware house.  She did not know whether Rob Martin also fired any shots.
>
> After the shooting, [Petitioner's] picture was shown on TV as a suspect. [Petitioner], Shannon Knight, Rob Martin and several other young people left for Miami the following day.

Doc. 6, exhibit B, p. 3.

**Section 2254 Standard of Review**

For claims which were properly exhausted and adjudicated in state court, this

court's review is limited.  "[A] determination of a factual issue made by a State court

shall be presumed to be correct," and Petitioner has "the burden of rebutting the

presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1);

Bui v. Haley, 321 F.3d 1304, 1322 (11th Cir. 2003) (citing the statute, footnote omitted). Moreover, as to a factual issue adjudicated by the state court, Petitioner must show that the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2); 321 F.3d at 1322 (citing the statute).  Section 2254(d)(2) is satisfied "only if it is shown by clear and convincing evidence that the state court's presumptively correct factual findings do not enjoy support in the record."  Lomholt v. Iowa, 327 F.3d 748 , 752 (8th Cir. 2003) (citing § 2254(e)(1), other citation omitted).

As to legal findings, a petitioner is entitled to federal habeas relief only if the state court's adjudication of the merits of the federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  § 2254(d)(1).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meanings.  Williams v. Taylor, 529 U.S. 362, 404-406, 120 S.Ct. 1495, 1519-1520, 146  L.Ed.2d 389 (2000) [1]; Bell v. Cone, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002) (citing Williams).  "[C]learly established Federal law, as determined by the Supreme Court of the United States," refers only to holdings of the Supreme Court, but decisions of lower federal courts may be considered to the extent that they demonstrate how those courts applied Supreme Court  precedent.  Hawkins v. Alabama, 318 F.3d 1302, 1309 (11th Cir. 2003) (citations omitted).

---

[1] This was Justice O'Connor's opinion for the Court in Part II; the rest of the opinion for the Court (Parts I, III, and IV) was by Justice Stevens.

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

529 U.S. at 412-413, 120 S.Ct. at 1523; 535 U.S. at 694, 122 S.Ct. at 1850.

The law governing ineffective assistance of counsel claims was clearly established in Strickland v. Washington, 466 U.S. 668, 690, 694, 104 S.Ct. 2052, 2066, 2068, 80 L.Ed.2d 674 (1984). Williams, 529 U.S. at 405-406, 120 S.Ct. at 1519-1520; Bell, 535 U.S. at 694-695, 122 S.Ct. at 1850. Under the two part test of Strickland, Petitioner must demonstrate both deficient performance and prejudice to the outcome.

To establish deficient performance, a petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." 466 U.S. at 690, 104 S.Ct. at 2066. In reviewing the claim, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 690, 104 S.Ct. at 2066. Petitioner has a heavy burden to establish the deficient performance prong of Strickland, by showing that "no competent counsel would have taken the action that his counsel did take." Fugate v. Head, 261 F.3d 1206, 1217 (11th Cir. 2001) (citation omitted). There are no rigid requirements, and "[g]ood advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others." 261 F.3d at 121 (citations omitted).

For prejudice, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694, 104 S.Ct. at 2068.

If the state court identifies and applies the framework of <u>Strickland</u> in assessing an ineffective assistance claim, its adjudication does not satisfy the "contrary to" language of § 2254(d)(1) even if this court might have applied <u>Strickland</u> differently. <u>Williams</u>, 529 U.S. at 406, 120 S.Ct. at 1520; <u>Bell</u>, 535 U.S. at 698, 122 S.Ct. at 1852. To determine whether the state court's adjudication was an "unreasonable application" of <u>Strickland</u>, Petitioner "must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance . . . .  Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner."  <u>Bell</u>, 535 U.S. at 698-699, 122 S.Ct. at 1852 (*citing* <u>Williams</u>).  "[T]he most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law."  <u>Williams v. Taylor</u>, 529 U.S. at 410, 120 S.Ct. at 1522.

**Ground one**

Petitioner contends that his Fifth and Sixth Amendment right to present evidence on his behalf was violated when the trial court refused to allow him to call Robert Martin as a witness.  This *federal* claim was raised and rejected on direct appeal in a *per curiam* decision.  Doc. 6, exhibit B, p. 10; <u>Beazley v. State</u>, 764 So. 2d 790 (Fla. 1st DCA 2000).

The rights to present evidence in a defendant's favor and to obtain favorable witnesses by compulsory process are secured by the Fifth and Sixth Amendments of the Constitution.  United States v. Hurn, 368 F.3d 1359, 1362 (11th Cir. 2004).

> In assessing a defendant's claims under the Fifth and Sixth Amendments to call witnesses in her defense, we engage in a two-step analysis. We first examine whether this right was actually violated, then turn to whether this error was "harmless beyond a reasonable doubt" under *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

368 F.3d at 1362-1363.  "A defendant's right to a fair trial is violated when the evidence excluded is material in the sense of a crucial, critical, highly significant factor."  *Id.* at 1363, quoting United States v. Ramos, 933 F.2d 968, 974 (11th Cir.1991).

Whether or not the evidence was properly excluded following rules of evidence is *not* the dispositive federal issue:

> [O]therwise relevant evidence may sometimes validly be excluded under the Rules of Evidence.  Nevertheless, the fact that a particular rule of evidence requires the exclusion of certain evidence is not dispositive, as particular applications of a generally valid rule may unconstitutionally deny a defendant his rights under the Compulsory Process or Due Process Clauses.  *See Knight v. Dugger*, 863 F.2d 705, 729 (11th Cir. 1988) (noting that a conviction must be reversed where there is "either clear error by the trial courts in their evidentiary rulings or compelling reasons for exceptions to state evidentiary or procedural rules").

United States v. Hurn, 368 F.3d at 1363 n.2.  Similarly, the fact that evidence was *improperly* excluded under state evidence law does not, standing alone, state a federal claim.  Thigpen v. Thigpen, 926 F.2d 1003, 1009-1010 (11th Cir. 1991).  Still, the beginning point is to determine if a state evidence law error was committed, and this is a factor in determining whether the trial was fundamentally unfair so as to violate federal rights.  926 F.2d at 1012-1019.

The background of this claim is complicated, and the complications are not explored by Respondent.  The critical record issue is:  What was the state of the record as to what Robert Martin would have said had he been called as a witness for Petitioner at trial?  As noted above, the only witness who gave direct evidence for the State that Petitioner was the one who fired the shots toward the Bolware residence was Shannon Knight.

There were two trials.  The first began on January 7, 1999, and ended in a mistrial.  *Id.*, exhibit I, R. 101, 110 (trial minutes).  The transcript of this first trial is not in this record.  The second trial began on February 18, 1999.  *Id.*, p. 125 (trial minutes).  At the first trial, the State called Robert Martin as a witness in its case in chief and Petitioner cross examined him.  *Id.*, p. 103 (trial minutes).  Petitioner's trial counsel testified at the Rule 3.850 hearing that his strategy at the first trial was to blame Robert Martin as the perpetrator of the crimes.  Doc. 6, exhibit I, R. 356 (transcript page 21).

Petitioner's counsel thought that the State would call Robert Martin as a witness in the second trial.  In his opening statement, Petitioner's counsel said that Robert Martin, who was in the car that night, had agreed to testify against Petitioner in exchange for a 5 year sentence and no probation.  Doc. 6, exhibit A, transcript, p. 23.[2]  He then said:

---

[2] Although the transcript is in several volumes, it is sequentially numbered and the sequential transcript page numbers will be used, cited to as "p." followed by the number.  The trial transcript does not contain record on appeal page numbers.  A portion of exhibit A, however, and exhibit I (the record on appeal from denial of the Rule 3.850 motion) bear the stamped numbers as the record on appeal, and where record on appeal numbers appear, this report and recommendation will cite to those pages as "R." followed by the number.

> Our witnesses, key witnesses are inmates that were in jail with Robert
> Martin at one time or another and these witnesses will tell you that Robert
> Martin told them straight up that Jeremiah didn't have anything to do with
> it, that he wasn't there.

*Id.*, p. 25.  Counsel set forth what he expected each of these witnesses would say.  *Id.*,

p. 25.  Counsel also had a letter to Petitioner from Robert Martin that said "hey, sorry I

had to do this but [to] protect my deal and keep from getting a long prison sentence I

had to testify, I had to lie on you, I'm sorry, buddy, I had to do that."  *Id.*, pp. 25-26.

Petitioner's counsel initially made no argument that the testimony of Robert Martin

would conflict in any material way with the testimony of Shannon Knight.  *Id.*, pp. 22-29.

Robert Martin apparently had proven to be a slippery witness, and the State did

not call him in its case in chief.  *Id.*, pp. 2-3.  Petitioner attempted to call Robert Martin in

defense and the prosecution objected  *Id.*, p. 317.  The jury was excused.  *Id.*, p. 318.

The State argued that Petitioner's intent was "simply to get the impeachment of him

before the jury.  And the evidence code does not allow calling a witness for that

purpose."  *Id.*  Cited for this was FLA. STAT. § 90.608(2).  *Id.*

Petitioner's attorney argued that he wanted to call Martin "to give his version of

the events that took place before, during, and after, the acts that lead up to these

charges.  He's a witness.  He was, claims to have been present while all of it took

place."  *Id.*, p. 319.  The prosecutor admitted that if Martin planned to testify that

Petitioner had nothing to do with the shooting, "there's nothing I can do to stop that."  *Id.*

The court requested that a proffer of Martin's testimony be made.  *Id.*, p. 321.

Robert Martin was then examined in proffer.  *Id.*, p. 323.  He testified that he

participated in the shooting.  *Id.*, p. 324.  He said that he, Shannon Knight, and

Petitioner were in the car.  *Id.* and p. 330.  He said they had two guns, two "357's."  *Id.*,

p. 325.  He identified two guns shown to him as his.  *Id.*, p. 326.  He said that he did not

think that Shannon Knight could see that he had a gun, but he said that Petitioner's gun

was in plain sight, up front, and Shannon Knight could see it.  *Id.*, pp. 327-328.  Martin

said he shot one gun several times during the incident.  *Id.*, p. 336.

     Martin did not, however, say one way or the other whether Petitioner shot the

gun that he had because he was not asked that question.  Further, while Martin testified

in the first trial (see the minutes from the first trial noted above), and *presumably*

testified that Petitioner fired one of the guns that night, that testimony is not in the record

before this court.  This is probably a safe assumption, however, in view of the opening

argument by Petitioner's counsel.

     Martin said that after the shooting, they went to "George's apartment" and did not

stop at McDonald's.  *Id.*, p. 328.  Martin said that when they were getting into the car

with the guns to go to the residence to do the shooting, one of the guns went off and

blew a hole in the backseat floorboard of the car.  *Id.*, p. 335.

     Martin admitted writing and sending a letter to Petitioner apologizing for "lying on

him," but he said he copied it "word-for-word from a letter Jeremiah gave me."  *Id.*, p.

331.  Martin denied telling inmates "at CCA that Jeremiah Beazley was not in the car

and had nothing to do with this."  *Id.*, pp. 333-334.

     The prosecution then renewed its objection, arguing that the testimony elicited

from Martin by Petitioner in the proffer was primarily to set up impeachment of Martin.

*Id.*, p. 337.  The court sustained the objection.  *Id.*, p. 338.  Petitioner's attorney offered

to call Martin only to give his version of events as they differed from prosecution

witnesses, and not to get into "those areas of impeachment," meaning the complicity of
Petitioner. *Id.*, p. 339. The prosecution pointed out that if Petitioner called Martin to
testify that he (Martin) was in the car and shot a gun, but failed to ask if Petitioner was
there, then on cross examination the State would have to ask whether Petitioner was in
the car and also shot a gun. *Id.*, p. 340. The prosecution said it could not imagine
Petitioner asking Martin whether Petitioner was there. *Id.*, p. 343. Petitioner's counsel
admitted, however, he would have to ask Martin "who all was in the vehicle" "if I'm
boxed in." *Id.*, p. 342. The court sustained the objection. *Id.*, p. 344.

The utility of testimony from Martin must be viewed against the other evidence.
Shannon Knight testified that she knew Petitioner and Robert Martin. *Id.*, p. 138. She
said that she saw them on September 30th after work, at about 5 or 5:30 p.m. *Id.*, p.
1389. Apparently they were at her apartment when she got home because Knight said
she then left her apartment with Petitioner and Martin in a red Mustang owned by
"Jessica." *Id.*, p. 140. She said that she did not know where they were going when they
left, but Petitioner gave her directions. *Id.*, p. 141. She said that Petitioner was looking
for someone to be standing outside. *Id.*, p. 142. She said that the first time she saw the
gun was when Petitioner started firing it. *Id.* and p. 144. Knight said: "I was like, what
the heck are you doing. . . . I was freaking out." *Id.*, p. 144. She did not mention
seeing a gun going off at the beginning of this trip and shooting a hole in the vehicle's
floorboard.

Knight said she drove toward McDonald's. *Id.*, p. 145. At McDonald's she said
she stopped and got out of the car. *Id.*, p. 146. "I got out of the car and started walking
and then we were all yelling and stuff and I got back in the car and they took me home."

*Id*. She could not remember who was driving when they got back into the car. *Id.*, p. 147. They then went back to her apartment and Petitioner and Martin left with the red Mustang. *Id*. Petitioner told her that someone named "Nail," who she had heard of before, had stolen $8,000 worth of stereo equipment "out of his Chevelle." *Id.*,pp. 147-148.

Knight testified that she, Petitioner, and several others then went to the Miami area and rented an apartment; the two women on this trip planned to get jobs. *Id.*, pp. 150-155. Petitioner colored his hair a different color. *Id.*, p. 156. Petitioner asked Knight to change her appearance, but she did not. *Id.*, pp. 156-157. Petitioner told Knight that he had "tooken care of business" about the loss of his stereo equipment, and that he had been gunning for "Nail." *Id*. "Nail" it was later revealed to be Jonathan Bolware. *Id.*, p. 213.

Knight was arrested and charged as a principal to attempted murder by aiding and abetting, and entered a plea. *Id.*, pp. 158-159. The plea provided for a sentence of 5 years and required that she testify truthfully in any case involving the shooting. *Id.*, p. 159. Petitioner and Knight were together when both were arrested. At the arrest, Petitioner told Knight that "snitches were found in ditches." *Id.*, p. 160.

George Perkins testified for the State that on October 2nd, two days after the shooting, the police seized three .357 handguns and a Mack 11 nine millimeter handgun from under his bed. *Id.*, p. 205. He said that Petitioner brought them to him and "asked me to hold onto them." *Id.*, p. 206. Petitioner had brought the guns to Perkins three or four days before the shooting. *Id.*, p. 221.

Perkins testified that on September 30th, the day of the shooting, Petitioner came over to his residence with Robert Martin, and Petitioner said that "he knew who took it, he knew who ripped him off and he wanted me to come with him." *Id.*, p. 207. Petitioner said he was going to fire "some warning shots to send out a message." *Id.*, p. 210. From Perkins's residence Petitioner then took a .357 handgun that had been brought over earlier. *Id.*, p. 207. Petitioner and Martin left at about 6:30 [p.m.]. *Id.*, p. 208. Perkins did not go with him. *Id.*, p. 207.

When Perkins saw Petitioner again, 30 minutes later, he had with him the .357 handgun he had taken as noted above and also an "M 11." *Id.*, pp. 209, 222. Robert Martin had a handful of empty cartridges. *Id.* Petitioner brought the guns in and made Perkins hold the guns for him. *Id.*, pp. 209-210. Petitioner told Perkins: "[I]t was pretty gruesome, he [Petitioner] fired some shots at them, fired some warning shots to send out a message, let him know not to rip him off again." *Id.*, p. 210. Perkins was asked if Petitioner left the M 11 and the .357 with Perkins that night, and Perkins said, "No, sir, he reloaded it and took off, took off with it again." *Id.*, p. 211. Perkins said:

> Jeremiah came back over, he said they're driving by my house now, he said I know it was them because of all the holes in their car. He said they want to play games, this is my game, I don't ever lose. He had socks on up to his elbow and he was reloading the guns, the clips.

*Id.*, p. 224.

The next day after work (October 1st), Perkins had a message on his telephone answering machine from Petitioner stating that Petitioner had put the guns back under Perkins's bed, and the guns were there. *Id.*, p. 211. Perkins had left the door unlocked. *Id.*, p. 226. Perkins called Petitioner to ask him to come get them, and Petitioner told

Perkins to "let it slide, whatever happens don't say nothing, he would be over later to pick them up." *Id.*, pp. 211-212.  The guns were still there on October 2nd (when the search took place). *Id.*, p. 212.  Later, Petitioner told Perkins to blame it all on Robert Martin. *Id.*, p. 217.

The trial court's evidentiary ruling was governed by Florida law concerning impeachment of one's own witness:

> Generally, however, *if a party knowingly calls a witness for the primary purpose of introducing a prior statement which otherwise would be inadmissible, impeachment should ordinarily be excluded.*  On the other hand, a party may always impeach its witness if the witness gives affirmatively harmful testimony.  *In a case where a witness gives both favorable and unfavorable testimony, the party calling the witness should usually be permitted to impeach the witness with a prior inconsistent statement.*  Of course, the statement should be truly inconsistent, and caution should be exercised in permitting impeachment of a witness who has given favorable testimony but simply fails to recall every detail unless the witness appears to be fabricating.  In addressing these issues, trial judges must have broad discretion in determining whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice or confusion.

Morton v. State, 689 So. 2d 259, 264 (Fla. 2001), *receded from on other grounds*, Rodriguez v. State, 753 So. 2d 29, 47 (Fla. 2000) (reaffirming the rule that impeaching evidence cannot be used as substantive evidence as to guilt but may be used at the penalty phase in a death case).

It is still unclear on the record supplied by Respondent whether Robert Martin would have testified that Petitioner also did some shooting out of the car that day.  It is plain that he would have said that Petitioner was in the car with a handgun, however.

But in any event, the primary reason that Petitioner wanted to call Martin as a witness was to set him up as a dummy to be knocked down by the impeaching

statements of the jail inmates (that he told them that Petitioner was not in the car that night) and by his "I lied on you" letter to Petitioner.  The three inconsistencies with the testimony of Knight were too trivial to undermine the State's argument that the primary purpose was to get in the impeaching evidence as substantive evidence.  Since the trial judge under Florida law had "broad discretion" as to this evidentiary issue, <u>Morton v. State</u>, 689 So. 2d at 264, the result on appeal was a foregone conclusion in favor of the State as a matter of state law.

   All of this, however, strays from the point.  The federal claim is that Petitioner's Sixth and Fifth Amendment rights to put on evidence in defense was violated by the refusal of the trial court to allow Petitioner to call Robert Martin as a witness.  It was not. Martin was a useless witness for both the State and Petitioner.  He had thoroughly impeached himself.  Still, had he testified, he would have been more harmful than helpful.  He would have testified that Petitioner was in the car and had a gun, just as Knight had said he was, and as Perkins implied in his testimony.  He would have said that Petitioner told him to write the "I lied on you" letter, just as Petitioner had told Knight and Perkins to lie to the police about Petitioner's culpability.

   The collateral impeachment of Knight's testimony by Martin's expected testimony was not important.  Had she been asked, Knight probably would have denied that a gun went off and shot a hole in the vehicle floorboard at the outset of the shooting episode since she denied seeing any gun until Petitioner opened fire.  Moreover, Jessica Lees testified that her red Mustang did not have a bullet hole in the floorboard.  Doc. 6, exhibit A, p. 121.  Had Martin testified to shooting a hole in the floorboard, it is doubtful

that the jury would have believed him, particularly in view of the other significant impeachment of Martin that would have occurred.

Whether the three stopped briefly after the shooting at McDonald's while Knight, Martin, and Petitioner yelled at each other (as Knight testified) and whether Knight saw Petitioner's gun before the shooting began (as Martin testified) were collateral matters, and unlikely to erode the jury's confidence in the testimony of either Perkins or Knight. Martin might have recalled stopping briefly at McDonald's had he been pressed on the point.  Knight may or may not have admitted seeing Petitioner's gun before the shooting began, but had she stuck to her story, that she did not see the gun until Petitioner began to shoot, the jury might have believed only that Knight was trying to minimize her own culpability.  This still would not have lessen Petitioner's culpability, that he had the gun and shot it.

Therefore, Martin's testimony was not "a crucial, critical, highly significant factor" in Petitioner's defense.  As a consequence, the federal claim is without merit.

**Ground two**

Petitioner contends that he was denied a fundamentally fair trial in violation of due process because he was originally charged with attempted first degree murder of only Domello Bolware, but was convicted on jury instructions which permitted the jury to find the lesser included offense of attempted manslaughter of "Jonathan Bolware and/or Domello Bolware."  Petitioner contends it was unfair to permit the jury to convict with an "and/or" option where only Domello Bolware was alleged as the victim in the charging document.

Respondent contends that the information was orally amended before the trial. Doc. 5, p. 9.  Cited for this contention is page 207 of exhibit A.  The citation is found in Appellant's brief on direct appeal.  Doc. 6, exhibit C, p. 12.  The citation is to the transcript of the first trial which was not filed with Respondent's answer.  *Id.*  It is contended in that brief that amendment to the information was granted, to add "and/or Jonathan Bolware" as a second possible victim, without objection from Petitioner.  *Id.*  The transcript of the first trial is not before this court, and the minutes of the first trial do not record that the information was amended.  Doc. 6, exhibit I, pp. 101-109.  The type-written information apparently was never amended on paper because the information which went up in the record on direct appeal and on appeal from the denial of the Rule 3.850 motion does not show any amendment.  Doc. 6, exhibit A, p. 31; exhibit I, p. 31.

While the record of the first trial is not before the court, Petitioner had an opportunity to object to Respondent's factual assertion in the traverse but did not.  Doc. 11, p. 3.  I will assume the assertion is true and that the information was amended at the first trial without objection.  That being the case, the claim fails.  It was permissible to charge the jury as alleged by Petitioner.  If, however, Petitioner objects to this conclusion as factually in error, Respondent should respond to the objection by filing a copy of page 207 of the transcript of the first trial.

**Ground three**

Petitioner contends that his convictions in counts three, four, and five violated the Double Jeopardy Clause.  The argument is that there was only one criminal episode, and that the offense should not have been divided into three instances of shooting into a dwelling.  The argument is based upon the statute, which proscribes the shooting into

"any" dwelling.[3]  Petitioner argues that the use of the word "any" indicates legislative intent that there be only one offense of shooting into dwellings arising from one criminal shooting episode.

The argument was raised on direct appeal.  The argument flows from cases like State v. Martin, 462 So. 2d 813 (Fla. 1985).  In that case, a state prisoner had possession of two knives in prison.  The issue was whether he could be convicted of two offenses, one for each knife.  FLA. STAT. § 944.47(1)(a)5 proscribes the introduction of "*any* firearm or weapon" into a state correctional institution.  The Court held that the use of the word "any" reflected legislative intent that only one conviction could be had for the possession of two weapons in a single episode.  462 So. 2d at 814.

The Double Jeopardy Clause protects against three distinct abuses:  a second prosecution for the same offense after acquittal; a second prosecution for the same offense after conviction; and multiple punishments for the same offense. North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct 2072, 2076, 23 L.Ed.2d 656 (1969).  Only the "multiple punishments for the same offense" double jeopardy claim is involved in this case because this case involves only one prosecution.  United States v. Kaiser, 893 F.2d 1300, 1304 (11th Cir. 1990).

The information charged shooting into a dwelling at 919-A Cone Avenue (count three), at 917 Cone Avenue (count four), and 915 Cone Avenue (count five).  Doc. 6, exhibit A, pp. 31-32.  It must be assumed that Florida criminal law proscribes three

---

[3] FLA. STAT. § 790.19 provides: "Whoever, wantonly or maliciously, shoots at, within, or into . . . *any* public or private building, occupied or unoccupied . . . shall be guilty of a felony of the second degree . . . ."  (Emphasis added.)

criminal offenses in this instance since Petitioner lost the state law argument on direct appeal.  *See* Hall v. Wainwright, 493 F.2d 37, 39 (5th Cir. 1974).[4]  In Hall, the petitioner argued that two convictions and consecutive sentences for theft of money arising from a single robbery of an A & P grocery store (taking money from the store manager and from a customer) constituted double jeopardy.  The Fifth Circuit denied the petition:

> Both the Florida court of appeal and the Supreme Court of Florida, by its denial of certiorari, found the facts in Hall's case to be outside the doctrine [single larceny doctrine] as declared by Florida courts.  There the matter ends.  Determination of state law by courts of that state is binding upon federal courts, and consequently the district court below was bound by Florida's interpretation of Florida law.

493 F.2d at 39.

The First District Court of Appeal in the case at bar heard Petitioner's argument that Florida law does not allow three convictions for one episode of shooting in a neighborhood, and rejected it.  This undoubtedly was the ruling, despite the lack of a written opinion by the appellate court.  Florida courts have not looked favorably upon a construction of a criminal statute which permits only a single criminal conviction when multiple human beings have been put at risk of serious bodily harm.  For example, in Bautista v. State, 863 So. 2d 1180 (Fla. 2003), the Court was faced with the question of whether two convictions for DUI manslaughter were allowed where one DUI episode resulted in the death of two persons.  The statute at issue there, FLA. STAT. § 316.193(3)(c)3, created the crime of DUI manslaughter when there was the "death of

---

[4] The Eleventh Circuit adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981, and of Unit B of the former Fifth Circuit.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981); Stein v. Reynolds, Inc., 667 F.2d 33, 34 (11th Cir. 1982).

*any* human being."  (Emphasis added).  After reviewing the history of homicide statutes,

the Court found that:  "Homicides are punished based on the number of victims because

the legislative purpose behind homicide statutes is to safeguard the lives of individuals."

863 So. 2d at 1186.  The Court was critical of the "a/any" test as failing to apply the

normal rules to determine legislative intent in the face of ambiguity.[5]  *Id.*   The Court

held that the "a/any" test used in cases like <u>Martin</u> "is not an infallible or exclusive

indicator of legislative intent.  Rather, absent clear legislative intent to the contrary, the

a/any test serves as a valuable but nonexclusive means to assist courts in determining

the intended unit of prosecution."  863 So. 2d at 1188.

     While no Florida cases have been found approving of multiple charges of

shooting into a dwelling where multiple dwellings have been hit, Florida law indicates

that this is intended by the Florida Legislature.  FLA. STAT. § 775.021(4) (1997)

provided:

> (4)(a) Whoever, in the course of one criminal transaction or episode, commits an act or acts which constitute one or more separate criminal offenses, upon conviction and adjudication of guilt, shall be sentenced separately for each criminal offense; and the sentencing judge may order the sentences to be served concurrently or consecutively.  *For the purposes of this subsection, offenses are separate if each offense requires proof of an element that the other does not, without regard to the accusatory pleading or the proof adduced at trial.*

>   (b) The intent of the Legislature is to convict and sentence for each criminal offense committed in the course of one criminal episode or transaction and not to allow the principle of lenity as set forth in subsection

---

    [5] "If the adjective 'any' is used, an ambiguity of legislative intent arises.  Instead of using the traditional tools for determining legislative intent, the a/any test simply applies the rule of lenity to this ambiguity and precludes more than one unit of prosecution.  *This latter result avoids determining legislative intent rather than ascertaining that intent.*"  863 So. 2d 1188 n.9 (emphasis added).

(1) to determine legislative intent.  Exceptions to this rule of construction are:

> 1. Offenses which require identical elements of proof.
>
> 2. Offenses which are degrees of the same offense as provided by statute.
>
> 3. Offenses which are lesser offenses the statutory elements of which are subsumed by the greater offense.

(Emphasis added).  The fact that there were three different dwellings suffices to allow three convictions under Florida law as each charge would require proof of an element not found in the other.

Further, this is consistent with probable legislative intent.  Dwellings are places that usually have human beings in them, particularly at the time when these offenses were committed, in the evening, right after people have returned home from work.  *See* Lifred v. State, 643 So. 2d 94, 98 (Fla. 4th DCA 1994), *approved*, 692 So. 2d 889 (Fla. 1997) ("However, in the case of multiple discharges of a firearm at multiple victims, there are, by definition, separate violations of each victim's rights.").

Further, each shot fired arguably constituted a separate offense.  In State v. Reddick, 568 So. 2d 902 (Fla. 1990), the defendant fired four shots into a house occupied by six persons, killing one and wounding another.  568 So. 2d at 902.  He was convicted of first-degree murder for the killing with one bullet, attempted first-degree murder for the wounding with another bullet, and shooting into an occupied dwelling for the other two bullets fired.  *Id.*  He argued that multiple punishments were not proper for what was a single criminal act.  *Id.*  The Court rejected this argument.  *Id.*, at 903.  The Court rejected the notion that this was a single criminal act, finding that "each shot

constituted a separate incident."  *Id.*  The Court also noted:  "[I]t borders on the absurd

to believe that the legislature would intend that of a fusillade of shots into a house, only

the shots that struck people were unlawful, or that once one shot found a victim the

other shots could not be punished."[6]  *Id.*

Likewise, in this case it would be absurd to think that the Florida Legislature

would intend only one offense of shooting into a dwelling when someone fires a burst of

shots using an automatic weapon in a neighborhood of residences and hits more than

one dwelling.  Since Florida law creates three separate crimes for shooting into three

separate dwellings in one criminal episode, there was no multiple punishment for the

same offense.  The double jeopardy claim is without merit.

**Ground four**

Petitioner contends his trial attorney was ineffective for failing to move to dismiss

any two of counts three, four and five on double jeopardy grounds.  The double

jeopardy claim is without merit for the reasons discussed above.  The Rule 3.850 court

rejected this ineffective assistance of counsel claim, finding that the First District Court

of Appeal necessarily found that the double jeopardy claim raised on direct appeal was

without merit.  Doc. 6, exhibit I, R. 318.  Counsel could not be constitutionally ineffective

---

[6] *See also* Nicholson v. State, 757 So. 2d 1227 (Fla. 4th DCA), *review denied*, 786 So. 2d 579 (Fla. 2000) (recognizing that there is no double jeopardy bar precluding separate charges where the defendant threw a brick through the rear sliding door of a house followed immediately by his throwing a brick through a front window of the same house).  The case is not directly on point, however, as the court found that two crimes had been committed because there was a temporal break between the first brick and the second brick.  Here, there is arguably no temporal break when one fires an automatic handgun from a car, spraying bullets throughout a neighborhood.

for failing to raise a claim without merit.  Thus, the state court's adjudication of the merits of the federal claim has not "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  § 2254(d)(1).

**Ground five**

Petitioner contends that his lawyer was ineffective for failing to object to hearsay evidence at trial.  Three instances of alleged hearsay evidence are cited.

First, Panama City Police Patrol Officer Tim Burke had testified that after going to the scene of the shooting, he later that evening had contact with Petitioner at the "EZ store."  Doc. 6, exhibit A, p. 37.  This exchange then took place:

> Q. For what purpose did you have contact with Jeremiah Beazley on that evening.
>
> A. An unknown female had called in and possibly advised he may be the suspect in the shooting and we were looking for him.

*Id.*, p. 38.

The second is testimony of Panama City Police Detective Chris Pate.  Pate had been asked if he had become involved in the recovery of firearms at the Lake Ware Apartments.  *Id.*, p. 64.  He was then asked:

> Q. Tell the jury how you came to be at the Lake Ware Apartments?
>
> A. We got a tip that the vehicle used in the drive-by shooting, a red Mustang had been seen at the Lake Ware Apartments, just, 12th Street just off Beck.  We went into that area, we heard that the defendant, Mr. Beazley, had a friend there by the name of George Perkins.  Mr. Perkins lived at one of the apartments there in Lake Ware Apartments.

*Id.*, p. 64.  The officer then testified they went to the apartment of George Perkins at the Lake Ware Apartments and recovered underneath the mattress of a water bed an M 11 machine pistol, three .357 handguns, and bullets.  *Id.*, pp. 65-67.

The last concerns testimony by Domello Bolware.  Bolware testified that the shots were fired from a red Mustang with tinted windows.  *Id.*, pp. 79, 84.  He said he did not know Jeremiah Beazley.  *Id.*  He could not see the shooters at all.  *Id.*, p. 86.  He was asked if he had heard a rumor that he had been accused of stealing a stereo, the prosecution objected that this was hearsay, and the trial court overruled the objection.  *Id.*, p. 80.  He then was asked if he had come into contact that evening with someone he later found out to be Jeremiah Beazley.  *Id.*, p. 83.  He said yes, at the "junior food store."  *Id.*  He then was asked:

Q.    How did you come to be at that location?

A.    Somebody called my house and told me the police had Jeremiah Beazley at the junior store.

*Id.*, p. 84.

The trial court rejected this claim of ineffective assistance of counsel, finding that (1) the State did not base any argument to the jury on this evidence admitted without objection, (2) Petitioner's trial attorney testified that it was part of his strategy not to object to every possible item because of the possible adverse impact it could have on the jury, and (3) the items which are the basis of the claim were relatively unimportant because the case was complex, lengthy, and twenty-six witnesses testified.  Doc. 6, exhibit I, R. 318.

Petitioner's trial attorney testified at the Rule 3.850 hearing that it was his strategy not to object to everything.  *Id.*, p. 395.  He said that he thought that "juries get turned off if, if you jump up and make thousands of objections to testimony that's not harmful.  I think they feel like you're wasting their time.  They don't like it.  I'm trying to make them like me.  I'm trying to make them like my defendant."  *Id.*

Florida evidence law discourages this sort of evidence, and these objections might have been sustained.  "An extrajudicial statement to a police officer is generally not admissible for the purpose of explaining the logical sequence of events leading up to an investigation and arrest."  Pride v. State, 809 So. 2d 40, 42 (Fla. 1st DCA 2002).  "If an explanation is required, it is often enough to say that the officers received a tip or that they acted on information received, without repeating the details of the statements made to them by others."  *Id.*  Professor Ehrhardt explains:

> Testimony of a witness concerning an out-of-court statement by the victim of a crime, a defendant, or a police officer is hearsay if the out-of-court statement is offered to prove the truth of the matter asserted.  An investigating officer sometimes testifies concerning detailed information that was received during the investigation by the officer from third person, such as an informant or a radio dispatcher.  The testimony is hearsay if it is offered to prove the truth of the matter asserted by the informant or dispatcher.  Usually, evidence of the contents of a BOLO dispatch received over the police radio, the statement of a witness, or a tip received from a confidential informant is hearsay, whether or not it directly accuses the defendant.  If counsel attempts to avoid a hearsay objection by offering the testimony to show the officer's "course of conduct" leading to the arrest of the defendant or some similar purpose, the well-reasoned cases recognize that the testimony concerning the out-of-court statements is hearsay.[7]   If some explanation is necessary, the officer can testify that

---

[7] The rule is somewhat different in federal court.  Police officers are permitted to testify briefly as to hearsay matters which explain why they began an investigation.  Such testimony is offered not for the truth of the extrajudicial statements, but for the fact that such tips or complaints in fact were received by the police.  United States v.

the actions were "upon information received" rather than offering a detailed description of incriminating evidence against the defendant.  In *State v. Baird*, the Florida Supreme Court found the trial court committed error when it admitted the testimony of a law enforcement officer that the officer had received information that the defendant was a major gambler who was running a major gambling operation.  Although the prosecution argued that the testimony was not hearsay because it was offered to prove the motive of the officer rather than the truth of the matter asserted, the Baird court rejected the testimony since the officer's state of mind was not a material issue in the case. However, a few decisions continue to admit out-of-court statements to show course-of-conduct and logical sequence of events without analysis of the issue or recognition of the contrary authority.

WEST'S FLORIDA PRACTICE SERIES, EVIDENCE, Ch. 8, § 801.2, Charles W. Ehrhardt

(footnotes omitted).  Alternatively, had the court overruled the objection, it might have

instructed the jury that the statement was admitted only to show that it was said, to

explain the officer's conduct, and not for its truth.

The decision of Petitioner's trial attorney not to object, however, was not attorney

error.  It was a reasonable trial strategy.  The hearsay evidence was relatively

inconsequential in a trial that involved the testimony of 26 witnesses.  There was little to

be gained from an objection, except to make the jury impatient.

Further, prejudice to the outcome has not been shown.  The first statement had

three qualifiers:  an "unknown" female had "possibly advised" that Petitioner "may" be

the suspect in the shooting.  The details of this tip were not revealed, and the qualifiers

made it plain that it was nothing more than a tip.  A reasonable juror would know that

this information was of the type given to a police officer early in an investigation.  It was

not adequate to prove in any way that Petitioner was the person who fired the shots, but

---

Hawkins, 905 F.2d 1489, 1494-1496 and n.3 (11th Cir. 1990), *cert. denied*, 498 U.S. 1038 (1991).  The substance of such tips or complaints, however, is to be excluded.  *Id.*

was useful to explain why the officer contacted Petitioner at the convenience store and asked him questions.  Further, the testimony that the officer contacted Petitioner at the convenience store and asked him questions (which was coming into evidence anyway), standing alone, was enough for the jury to draw the conclusion that Petitioner was then a possible suspect.

The second hearsay statements contained more substantive information, that a red Mustang had been seen near the Lake Ware Apartments and that George Perkins was a friend of Petitioner.  But admission of this hearsay evidence was inconsequential as well.  There was direct evidence that a red Mustang had been the vehicle from which the shots were fired.  Shannon Knight testified that they drove in the red Mustang to the shooting and back to her apartment in the red Mustang after the shooting, and that Petitioner and Martin left immediately in the red Mustang.  There was direct evidence from George Perkins that he was Petitioner's friend and that Petitioner and Robert Martin had been to his apartment immediately before and after the shooting.  The hearsay evidence, like the first instance of hearsay, would have been viewed by the jury as only explanatory of the officer's investigative conduct, and not as significant proof of the matters as to which they had more direct proof.

The final instance of hearsay is trivial.  Domello Bolware testified that he did *not* know Petitioner.  He said he was present during the shooting and he could not see who did the shooting.  Thus, when he explained that he went to the convenience store because "somebody called my house and told me the police had Jeremiah Beazley at the junior store," the jury would reasonably conclude that this testimony simply explained why Bolware showed up at the convenience store as the police questioned

Petitioner.  At most, this would indicate Bolware's belief that the person questioned at the convenience store, who he did not know, was a possible suspect, but that was plain from other direct evidence.  There was nothing in this to prove that Petitioner in fact was the one who fired the shots.

Thus, the state court's adjudication of the merits of the federal claim has not "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1).  The basis for the rejection of the claim is fully supported by the record and the law of ineffective assistance of counsel.  Neither attorney error nor prejudice to the outcome has been shown.  This ineffective assistance of counsel claim affords no relief.

**Ground six**

Petitioner asserts that his attorney was ineffective for failing to object to questions by the prosecution which were leading and assumed facts not in evidence. The following is cited in support of this claim.

First, Jessica Lees was asked:

Q.      Was it ever mentioned that they took care of business?

A.      Yes.

Q.      Did you come to leave town with Jeremiah Beazley, Rob
        Martin, Shannon Knight and Steve Grazaka on Friday?

A.      Yes, sir.

Q.      Friday following the shooting incident?

A.      (Nods head affirmatively)

Doc. 6, exhibit A, p. 115-116.  Petitioner argues his attorney should have objected

because there had not been any evidence at that point of a shooting incident or "taking

care of business."

The second instance is also from Jessica Lees:

Q.    Who paid for the hotel?

A.    Jeremiah.

                          *              *              *

Q.    Who was paying for your food?

A.    Jeremiah.

Q.    How about the gas?

A.    Jeremiah.

Q.    How was he paying for it?  Cash?

A.    Yes, sir.

*Id.*, pp. 117-118.  Petitioner argues that this testimony was irrelevant because it was a

"trip that was separate from and independent to the charged offense," and prejudicial

because it implicated Petitioner as the leader of the group.

The third instance cited is again from Jessica Lees:

Q.    Let me ask you this.  Is the person that suggested that you
      leave, that paid for everything on the trip, that told you to
      leave your car in Miami in the courtroom today?

A.    Yes, sir.

*Id.*, p. 123.  Lees then pointed out Petitioner.  *Id.*  Petitioner argues that this was

objectionable because there was no evidence that Petitioner "suggested that you

leave."

The fourth and last instance is testimony that after the police interviewed George Perkins on October 2nd, and found that he had the weapons given to him by Petitioner, the police issued "a press release and announce[d] that Jeremiah Beazley was wanted for the shooting on the 900 block of Cone Avenue."  *Id.*, p. 183.  He argues that a press release had no bearing upon his guilt.

In ruling upon this claim, the Rule 3.850 court held in part that Petitioner had

> not shown that the cited areas of failing to object and assuming facts not in evidence was so prejudicial as to deprive him of a fair trial.  As to the "taking care of business issue," the State did, in fact, later present evidence which linked up the cited testimony to the shooting incident.

Doc. 6, exhibit I, R. 319.  The court also noted that it was trial counsel's strategy not to object to every single objectionable thing that happened.  *Id.*

The first series of questions were leading, but these are the type of leading questions often permitted to speed a trial along because the witness plainly was prepared to testify about this trip, when it occurred, and who went.  Lees had already said that September 30th was the day of the shooting incident.  Doc. 6, exhibit A, pp. 112-113.  Lees in fact had also testified that Petitioner had suggested that everyone leave, *id.*, p. 117, so the final question was not objectionable.  She was asked whose idea it was to leave town on Friday, and she said "Jeremiah."  *Id.*  The testimony that Petitioner said he had taken care of business was tied up with the testimony of Perkins, who said that Petitioner told him that he had "fired some shots at them, fired some warning shots to send out a message, let him know not to rip him off again."  *Id.*, p. 210. The press release evidence was the normal kind of evidence explaining what the police have done to investigate the offense and to explain that Petitioner's flight shortly after

the press release was evidence of guilt.  Finally, the questions about who paid for the

trip were not leading.  Further, evidence that Petitioner organized a trip to Miami right

after the shooting, took along everyone with knowledge of the shooting, and paid for

their expenses with cash, was evidence of flight.  The state court's adjudication of the

merits of this federal claim has not "resulted in a decision that was contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined

by the Supreme Court of the United States."  § 2254(d)(1).  Thus, ground six affords no

relief.

**Ground seven**

Petitioner contends his attorney was ineffective because in the course of trying to

impeach a witness, he elicited evidence to support the finding of Petitioner's guilt.  In the

first instance, Counsel asked Jessica Lees whether she had seen Petitioner with a gun

before, and she answered yes, the night of the shooting.  Doc. 6, exhibit A, p. 129.  She

had not said this on direct examination, and thus this was harmful evidence for

Petitioner.

However, counsel had just shown a gun to Lees, and she had just said she had

not ever seen him with that gun before.  *Id.*  Further, the question "have you ever seen

Jeremiah with a gun before" was not without a reasonable expectation that the answer

would be no.  Lees had previously been asked during the investigation by Officer Bates

"have you ever seen [Petitioner] with a firearm," and she had answered "no, sir."  *Id.*

When counsel attempted to impeach her with that prior answer, she admitted that she

had told this to Officer Bates, but then qualified it by saying she meant on the trip to

Miami.  The jury was left, therefore, with a prior statement to Officer Bates by Lees that

she had *never* seen Petitioner with a firearm and that she had never seen Petitioner with the gun shown to her by counsel.  The strategy was reasonable, under the circumstances, despite the unfortunate answer at the beginning.  Attorney error was not shown.

The second matter argued in this claim is the following.  On direct examination, Jessica Lees testified that on the night of the 30th, which she had identified as the day of the shooting, she saw Petitioner and others "back at the house" when she returned from the fair. Doc. 6, exhibit A, p. 114.  She had previously said that she and "Alicia" had taken another car and gone to the fair, leaving her car (the red Mustang) and the keys at her apartment with Petitioner, Martin, and Knight.  *Id.*, pp. 113-114.  She said that after she returned from the fair to her apartment, there was a conversation about what Petitioner, Rob Martin, and Shannon Knight "had been doing earlier that evening." *Id.*  In the conversation it was mentioned that someone had stolen some things from Petitioner's car.  *Id.*, p. 115.  She said that as a "result of that," "[t]hey took a ride and they got, they took my car —" *Id.*  She did not finish what she was going to say, and counsel asked the leading question whether it was mentioned that "they took care of business," and she answered yes.  *Id.*  She did not testify that she had heard Petitioner and Martin talking about the shooting.

On cross examination, Petitioner's counsel asked:

Q.     Is it your testimony that when you returned from the fair you heard Rob and Jeremiah talking about the shooting?

A.     Yes, sir.

*Id.*, p. 130.  Counsel then drew the attention of Lees to a prior statement to Detective

Bates, on October 20th of that year, where she denied hearing anything that night that

there had been a shooting.  *Id.*  He continued, drawing the attention of Lees to a

statement to Bates that she first heard about a shooting occurring on September 30th

when she got back from the fair, early in the morning of October 1st at about 2:30 a.m.,

and Rob and Petitioner were talking about it.  *Id.*, p. 131.  Lees said she did not

remember making those statements.  *Id.*, pp. 130-131.

        As to this second instance, Petitioner's counsel made a trial decision to try to

discredit Lees with her first statement to Detective Bates, that she had not heard

anything that night that there had been a shooting.  Lees had already said on direct that

when she returned from the fair, Petitioner and Martin were talking about what they had

done that night, that they had "taken care of business."  There was little harm and some

possible help in showing that Lees had been equivocal with Detective Bates.  She had

indeed said that the shooting had been talked about in the early morning hours of

October 1st, but this was inconsistent with her first assertion that she had not heard

anything about a shooting that night.  On the whole, while this was not significant

impeachment, it was not objectively unreasonable for counsel to have pursued this line

of inquiry.

        The third matter relied upon is in the cross examination of Shannon Knight.  On

cross, the following took place:

        Q.     Ma'am, whose idea was it to leave town?

        A.     Jeremiah's.

> Q.      Did you ever hear Jeremiah and Rob Martin bragging about
>         the shooting that had taken place?
>
> A.      Just saying they had done it, they had tooken (sic) care of
>         their business.

*Id.*, p. 169.  Knight had not specifically said on direct that Petitioner had the idea for the

group to leave town.  She had only said that she left town the next Friday, and the

others left as well, traveling in two vehicles.  *Id.*, p. 148.  She had also said that during

the trip, Petitioner said he had "tooken (sic) care of business."  *Id.*, p. 157.

Counsel then tried to impeach these responses.  He had two impeachment

matters he could use, but to set up the impeachment, he first had to ask Knight if it was

her testimony that it was Petitioner's idea to go to Miami, even though she had not said

this on direct.  He also had to ask the "bragging" question, and it was a fair conversion

of Knight's earlier testimony that asserting that "business had been taken care of" was

bragging, and it was the word used in the statements Knight had made to Detective

Bates.[8]  To do this, he had to get Knight to repeat her direct testimony.  He then asked

the following:

> Q.      Do you remember this question on Page 30.  10-27
>         statement.  Question.  Right after it happened and during the
>         whole time can you think of any time that they were bragging
>         about it.  Answer.  No, they never.
>
>                     *              *              *
>
> Q.      On Page 15, top of the page, do you remember this.
>         Approximately what time was it that Friday night when you
>         left town, just approximately.  Answer.  About 10:30 or 11.
>         Me and Jessica were leaving and they decided to come with

---

[8] The statement was given to Detective Bates by Knight on October 27, 1997.
*Id.*, p. 162.

> us.  Question.  You and Jessica were going to leave town.
> Where were y'all going.  Answer.  Miami.

*Id.*, pp. 169-170.  Knight said she did not remember those statements made to

Detective Bates.  *Id.*, p. 170.  Thus, the cross examination was good trial strategy.  It

was not attorney error to pursue this line of impeachment.

The final instance cited by Petitioner is in the cross examination of George

Perkins concerning how and when the guns came to be under his bed.  Perkins had

testified on direct as noted earlier, that when Petitioner and Martin returned, he had the

M 11 and a .357 handgun.  *Id.*, p. 209.  Martin said:  "[Petitioner] brought them in, asked

me to hold onto them."  *Id.*  The testimony on direct was somewhat confusing, however,

as Perkins had said that Petitioner brought the guns back, and then took one (or, as it

turns out, two), "reloaded it and took off, took off with it again."  *Id.*, p. 211.

On cross, Petitioner's counsel said he was confused and asked "how did the

guns get back out of your apartment?"  *Id.*, p. 224.  Perkins explained further that

Petitioner said they were "driving by my house now," and he reloaded the clips with

socks on his hands.  *Id.*  He said that one of the .357 handguns and the M 11 went back

out of his house.  *Id.*  This examination did not serve to impeach Perkins, but it was not

unreasonable for counsel to ask these questions, in light of the somewhat confusing

testimony of Perkins on direct.

The Rule 3.850 court reviewed this claim, found that Petitioner's counsel had a

reasonable strategy, and that there was no attorney error.  Doc. 6, exhibit I, R. 319.

Since this was correct, this did not result "in a decision that was contrary to, or involved

an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States."  § 2254(d)(1).  Therefore, ground seven affords

no relief.

**Ground eight**

Petitioner claims ineffective assistance of counsel regarding evidence of the

possession or sale of drugs by Petitioner.  Petitioner admits that his attorney filed a

motion in limine prior to trial seeking to exclude such evidence, but faults counsel for

asking two witnesses about drugs.

First, on cross examination of Panama City Police Detective Chris Pate, counsel

asked if there were any drugs found during the search of Perkins's apartment and Pate

said no.  Doc. 6, exhibit A, p. 72.  The second was in cross examination of Shannon

Knight.  This evidence did not concern whether Perkins had drugs, but whether

Petitioner and Martin had drugs.  Counsel asked Knight if anyone had asked her to take

Petitioner and Martin "anywhere that night," and she said "Jessica asked me to run

them up the road."  *Id*., p. 162.  He then asked if she believed "at the time that there

was some kind of drug delivery taking place," and she said yes.  *Id*.  He asked:  "You

didn't see any drugs though, did you?" and she said "No, sir."  *Id*., p. 163.

In denying this claim, the circuit court reasoned:

[D]efendant's counsel testified he believe that the witness, Perkins, had
drugs and tried to curry favor with the State by testifying against the
defendant.  The defendant's trial attorney testified the defendant was
advised of this trial strategy and the defendant also believed Perkins had
drugs and wanted this issue raised.  Furthermore, the defendant's trial
attorney did not bring in evidence that was otherwise not admissible.

Doc. 6, exhibit I, R. 319.  Thus, the trial court addressed only the first part of this claim.

Petitioner's attorney testified at the Rule 3.850 evidentiary hearing:

> That our contention was that there was [sic] drugs in George's [Perkins] apartment.  Mr. Beazley told me that.  I think somebody else told me.  And our theory was that George was not charged with these drugs in an effort to get him to testify favorably for the State.

*Id.*, R. 374 (transcript page 39).  He said that he was unsuccessful because Detective Bates said that no drugs were found, "[s]o we were stuck with that."  *Id.*  He also said that "Mr. Beazley insisted that I ask about that, too."  *Id.*, R. 375 (transcript page 40).

The trial court's denial of the first aspect of the claim is founded upon findings of fact which this court must now assume to be correct as Petitioner has not rebutted the finding by clear and convincing evidence.  That being the case, the trial court's finding that this was sound trial strategy which Petitioner himself wanted pursued is not unreasonable.

The drug evidence elicited from Shannon Knight is somewhat baffling, as a theory that Perkins had drugs should not have caused counsel to ask the question about whether Petitioner and Martin were selling drugs.  But there was no attorney error or prejudice to the outcome.  The jury might have wondered whether Petitioner was involved in the shooting because he was involved in selling drugs, and Knight's denial, that she had seen no drugs, laid that to rest in Petitioner's favor.  For these reasons, ground eight affords no relief.

**Ground nine**

Petitioner contends that his attorney was ineffective for failing to object to the State's improper impeachment method.  The impropriety, asserts Petitioner, is that the State read the prior statements directly into the record without first showing a prior statement inconsistent with present testimony.  This claim arises from the testimony of

Jamie Lescandret, a witness for the defense and Petitioner's former girlfriend of 7 years. *Id.*, p. 286.

On cross examination by the State, Lescandret denied that in August she and Petitioner had bought a gun because they both wanted the gun.  *Id.*, p. 300.  The prosecutor then read several statements made by Lescandret to Detectives Bates and Pate on October 6, 1997, which included a statement as to the buying of a "long gun," stating "he liked it and I liked it so I went and bought it."  *Id.*, p. 301.  It also included the following: "Did he want you to buy that gun.  And your answer was, I wanted to buy and he did, we both wanted to buy it."  *Id.*  After reading this to Lescandret, the prosecutor asked her "was that the answer that you gave on October 6th, 1997," and she answered "to the best of my knowledge."  *Id.*

Under Florida law, a prior inconsistent statement of a witness is admissible for impeachment:

> The theory of admissibility is not that the prior statement is true and the in-court testimony is false, but that because the witness has not told the truth in one of the statements, the jury should disbelieve both statements. See Florida Evidence § 614.1. To be inconsistent, a prior statement must either directly contradict or be materially different from the expected testimony at trial. The inconsistency must involve a material, significant fact rather than mere details.

Pearce v. State, 880 So. 2d 561, 569 (Fla. 2004).  The prior statement here was inconsistent with Lescandret's testimony.  The prosecutor did not thereafter try to prove the content of the prior inconsistent statements by introducing the written record of the statements Lescandret made to Detectives Bates and Pate.  There was no need, as Lescandret admitted to having made the prior inconsistent statement, and indeed, extrinsic evidence of the statement would not have then been allowed.  *Id.*, at 570.

> Before a witness can be impeached with a prior inconsistent statement,
> the proper foundation must be laid. Prior to questioning a witness about
> the contents of a previous inconsistent statement, counsel must call to the
> witness's attention the time, place, and person to whom the statement was
> allegedly made.

*Id.*, at 569-570.   The prosecutor did that here.  Doc. 6, exhibit A, pp. 296, 301.  Quoting

the precise question and answer is the correct way to lay the foundation for

impeachment.  *Id.*, citing Brumbley v. State, 453 So. 2d 381, 385 (Fla.1984) (finding it

proper for State to impeach witness by quoting the precise language of his prior

statements as "such references were a correct method of laying a predicate for the

introduction of the prior statements").

There was nothing improper under Florida law by this cross examination, as the

Rule 3.850 court found.  Doc. 6, exhibit I, R. 320.  Hence, there was no attorney error or

prejudice in failing to object.  The state court's adjudication of the merits of this federal

claim has not "resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of

the United States."  § 2254(d)(1).  Thus, ground nine affords no relief.

**Ground ten**

Petitioner asserts that he was deprived of effective assistance of counsel due to

the cumulative errors argued above in grounds five through nine.  This claim is without

merit for the reasons discussed above.

Petitioner also argues that his attorney was ineffective for failing to devise an

alternative trial strategy when Robert Martin became unavailable as a witness.  This is a

conclusory claim, without specifics.  Petitioner has not argued what other plausible

defense counsel could have presented.  The absence of Martin as a witness was a

legitimate trial tactic employed by the prosecution since Martin had become a witness without credibility.  The inability of counsel to call Martin as a witness on Petitioner's behalf was not due to error of counsel and it did not violate any other constitutional right as discussed above.

**Conclusion**

It is therefore **RECOMMENDED** that the court **DENY WITH PREJUDICE** the petition for writ of habeas corpus filed by Jeremiah E. Beazley pursuant to 28 U.S.C. § 2254, challenging his convictions in the Circuit Court of the Fourteenth Judicial Circuit, in and for Bay County, Florida, case number 97-2580.

**IN CHAMBERS** at Tallahassee, Florida, on February 10, 2005.


**s/     William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**